IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY &
NATIONWIDE MUTUAL INSURANCE
COMPANY,                                      *

    Plaintiffs,                          *

v.                                            *     Case No. 1:19-cv-00068

BEAZER HOMES LLC                              *
                                              *
    Defendant.
                                              *

******
## MEMORANDUM OPINION

The case is before me for all proceedings by the consent of the parties pursuant to 28 U.S.C. § 636(c). (ECF No. 25). Now pending is Plaintiff Nationwide Mutual Fire Insurance Company and Nationwide Mutual Insurance Company's ("collectively Nationwide") Motion for Summary Judgment on all counts (ECF No. 30), and Beazer Home, LLC's (Beazer") Cross Motion for Partial Summary Judgment. (ECF No. 42). Nationwide filed a combined Opposition to Beazer's motion and Reply. (ECF No. 44). Beazer filed its own Reply. (ECF No. 47). No hearing is needed. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons stated below:

1. Plaintiffs' Motion for Summary Judgment is **GRANTED**; and
2. Defendant's Cross-Motion for Partial Summary Judgment is **DENIED**.

### I.    BACKGROUND

Plaintiffs Nationwide are insurers organized under the State of Ohio and have their principal place of business in Ohio. (ECF No. 1 at p. 2). Defendant Beazer, a builder and

1

property developer, is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. *Id.*

Beazer and various partners developed a mixed-use development, known as The Quarry at Greenspring, in Baltimore County, Maryland that includes retail, office, and residential space. (*Id*. at p. 3; ECF No. 30-1 at p. 2). This dispute concerns whether Nationwide's policies provide coverage for Beazer in two separate but related lawsuits brought against it by two homeowners associations, Greenspring Quarry Association ("GQA") and Highlands at Greenspring Quarry Village Association ("Highlands") (collectively, the "Associations") to recover the costs incurred in maintaining and repairing common areas within the development.[1] (ECF No. 30-1 at p. 2). Beazer has resolved both suits. (ECF No. 47 at p. 13).

**The Underlying Suits by GQA and Highlands**

According to the complaints in the underlying lawsuits,[2] to facilitate the development, construction and eventual sale of the various segments of the overall project, it was necessary to identify certain common areas which would serve the needs of the entire project, including roads, lighting, drainage, utilities, sever connections, fencing, landscaping, security gates and identifying markers, and contained jointly used amenities such as a pool, tennis courts, and a clubhouse. (ECF No. 30-2 at pp. 4–5). To manage and govern the use and maintenance of the

---

[1] In *Greenspring Quarry Association v. Beazer Homes,* Civil Action No. 1:17-cv-00645, GQA alleged that at the time that Beazer owned the common areas, Beazer still charged GQA for the expenses associated with them, including lighting, repair of roads, snow removal, landscaping, and the maintenance and repair of security gates and fences. (ECF No. 30-1 at p. 3). Similarly, in *Highlands at Greenspring Quarry Village Association,* Civil Action No. 1:17-cv-00646, Highlands claimed that Beazer was obligated to maintain the common areas, but instead, it instructed the "Association's Board of Directors, which it controlled, to instruct the property management company to bill the Association for all maintenance expenses associated with the common areas." *Id.* at p. 4.

[2] The complaints are virtually identical. *See* (ECF Nos. 30-2 and 30-3). Additionally, although there was a separate "Declaration of Covenants, Conditions and Restrictions" for each Association, the provisions at issue in the underlying lawsuits are the same. *Id*. For this reason, the Court will cite to GQA's Complaint and accompanying Declaration of Covenants, Conditions and Restrictions.

2

common areas, Beazer, together with its co-developers, executed and recorded a Declaration of Covenants, Conditions and Restrictions (the "Declaration of Covenants"). *Id*. Pursuant to the Declaration of Covenants, a "Master Association" (*i.e*., GQA) would be formed, comprising the four constituent Village Associations (of which Highlands was one). *Id*. Beazer named a group of its own employees and agents to serve as a majority of the initial GQA Board of Directors and continued to have undue influence over GQA's Board even after further elections/appointments. *Id*. at p. 5.[3] In turn, Beazer caused the GQA Board to hire Tidewater Property Management, Inc. ("Tidewater"), an entity with which it had close business relationships, to manage the property, including facilitating the payment of expenses for the common areas by improperly billing the Associations. *Id*. at pp. 5–6.

Although the common areas were initially owned and maintained by Beazer, the Declaration of Covenants provided that Beazer would convey title to the common areas to GQA within ten years. At the time of such conveyances, Beazer's obligation to maintain the common areas so conveyed would cease, with those obligations passing to GQA and its constituent associations.[4] *Id*. at p. 6. The lawsuits allege that through its influence over the GQA Board of Directors and Tidewater, Beazer shifted the expenses for common area maintenance to GQA prematurely (who, in turn, presumably passed it on to its constituent Village Associations and

---

[3] Initially, GQA's Articles of Incorporation gave Beazer the right to appoint a majority of GQA's Board, presumably because there were not yet many, if any, individual unit-owners in the Village Associations. (ECF No. 42-1 at p. 5). Eventually, each Village Association, through its board of directors, was empowered to select one delegate for the Master Association, GQA, each of whom would have one vote. (ECF No. 30-2 at p. 52). The Court presumes that Beazer, by virtue of its ownership interests in various parcels/units with the Village Associations until such units were eventually resold, also selected the members of the boards of directors for some or all the four Village Associations making up GQA.

[4] This suggests that the different Beazer-owned common areas would be conveyed to GQA at different times.

3

ultimately individual unit-owners within those various associations), in violation of the Declaration of Covenants. *Id*. at pp. 6–7.

**Nationwide's Insurance Policies**

Nationwide insured GQA and Highlands by way of two Premier Businessowners Policies. (ECF No. 1 at pp. 6–7). The first, Premier Businessowners Policy number ACP BPHF 5183147087 ("Policy 7807) was issued to GQA effective from December 15, 2009 to December 15, 2018. (ECF Nos. 1-4 to 1-12). The second, Premier Businessowners Policy, number ACP BPHM 2404155109 ("Policy 5109") was issued to the Highlands effective August 2009 to August 2018. (ECF Nos. 1-13 to 1-21). Nationwide argues that neither policy provides coverage because Beazer was not an "insured" under the applicable definitions, and, in any event, the existing coverage did not encompass the kind of liability alleged in the underlying lawsuits.

## II. STANDARD OF REVIEW

This Court has diversity jurisdiction over the instant action pursuant to 28 U.S.C. § 1332, as there is no dispute that the parties are citizens of different states and the initial matter in controversy exceeds $75,000. (ECF No. 1 at p. 3). Further, the Federal Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a); *See also All-Star Settlements, LLC v. Zurich Am. Ins. Co.*, 2011 WL 4543363, at *2–3 (D. Md. Sept. 28, 2011) (deeming it appropriate to exercise jurisdiction where ruling will clarify and settle the legal relations between the parties).

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party accomplish this by demonstrating the absence of any genuine dispute of material fact or by showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). A court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). However, a court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

Where, as here, the parties have filed cross-motions for summary judgment, this does not alter the summary judgment standard; rather, this Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. *See Gemini Ins. Co. v. Earth Treks, Inc.*, 260 F. Supp. 3d 467, 475 (D. Md. 2017), *aff'd*, 728

F. App'x 182 (4th Cir. 2018). "When considering each individual motion, the Court must 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing the motion. *CX Reinsurance Co. Ltd. v. Levitas*, 207 F. Supp. 3d 566, 573 (D. Md. 2016) (quoting *Rossingol v. Voorhar*, 316 F.3d 516, 523 (4th Cir. 2003)).

## III. DISCUSSION

In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Allstate Ins. Co. v. Rochkind*, 381 F. Supp. 3d 488, 498 (D. Md. 2019). Because the Policies were delivered in Maryland, contain a Maryland Amendatory Provision, and the parties agree that Maryland law governs their claims (ECF No. 42-1 at p. 16), this Court need not inquire further into the choice-of-law questions and will apply Maryland law. *Allstate*, 381 F. Supp. 3d at 498.

"Maryland law is well settled that 'the interpretation of an insurance policy is governed by the same principles generally applicable to the constructions of other contracts.'" *Id.* at 508 (quoting *Mitchell v. AARP*, 140 Md. App. 102, 116 (2001)). Accordingly, the ordinary principles of contract interpretation apply— specifically, the objective interpretation of contracts— when evaluating the terms of the insurance contract itself. *CX,* 207 F. Supp. 3d at 574; *Allstate*, 381 F. Supp. 3d at 508. Hence, the Court gives the words of an insurance contract their customary, ordinary, and accepted meaning, as determined by the fictional "reasonably prudent layperson." *Connors v. GEICO*, 442 Md. 466, 482 (2015). A "term is considered 'ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning.'" *Connors*, 442 Md. at 482 (quoting *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305–06 (2000)).

Moreover, under Maryland law, "an insurance policy, like any other contract, must be construed as a whole to determine the parties' intentions." *Arajona v. St. Paul Fire & Marine Ins. Co.*, 281 Md. 371, 375 (1977). This includes an examination of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution. *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388 (1985). A court should "read the Endorsement and the Policy together as a single contract." *Capital City Real Estate LLC v. Certain Underwriters*, 788 F.3d 375, 379 (4th Cir. 2015). "However, '[i]f the endorsement conflicts with the main policy, the endorsement controls.'" *Id.* (quoting *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 173 (2005)). If a contract's language is plain and unambiguous, the court will enforce the terms of the policy as a matter of law. *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 237 Md. App. 705, 722 (2018). In such an instance, the "court has no alternative but to enforce those terms." *Megonnell v. United Services Auto Ass'n*, 368 Md. 633, 656 (2002).

However, if a contractual term (within the policy itself) is ambiguous, a court may "turn to extrinsic evidence to determine the intent of the parties." *Connors*, 442 Md. at 480–81. *See Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd.*, 843 F.3d 133, 138 (4th Cir. 2016) (recognizing only the policy itself, not any extrinsic sources, can create an ambiguity). If ambiguity persists after examining extrinsic evidence, Maryland law directs that such language be construed "liberally in favor of the insured and against the insurer as *drafter of the instrument*." *Capital City*, 788 F.3d at 379.

The duty to defend is broader than the duty to indemnify, but is not limitless.[5] In determining whether an insurer has a duty to defend under an insurance policy, Maryland courts apply the following test:

> (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the [underlying] action potentially bring the [underlying] claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses on the allegations of the [underlying] suit. At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue.

*Capital City*, 788 F.3d at 379.

In order to establish a duty to defend, allegations of the complaint must be analyzed to determine whether there is a "potentiality" that the claim may be covered by the policy. *Perdue Farms, Inc. v. Traveler's Cas. & Surety Co.*, 448 F.3d 252, 259 (4th Cir. 2006). The party seeking coverage has the burden of proving that the claim is within the policy's insuring agreement. Further, the insurer has the burden of proving the applicability of any exclusions to coverage. *Id.* at 258.

The crux of both motions for summary judgment is whether the insurance policy provides liability coverage for the injury claimed by the Associations. Correspondingly, the Court will first review the Policies at issue to determine the scope, and any limitations, within the insurance coverage, including whether the policy language presents ambiguity. For purposes of the present dispute, the two policies are not materially different and will be analyzed together. Thus, the contract's terms must be consulted, and the coverage at issue requires analyses of three documents: (1) the Premier Businessowners Liability Coverage Form ("Liability Coverage

---
[5] *See Perdue Farms*, 448 F.3d 252 ("Under the typical liability insurance policy, the insurer has a duty to indemnify the insured, up to the limits of the policy, for the payment of a judgment based on a liability claim which is covered. The insurer also has a duty to defend the insured against a claim which is *covered* or *potentially covered.* (quoting *Mesmer v. MAIF*, 353 Md. 241, 257 (1999))).

Form"); (2) the Maryland Amendatory Endorsement ("MAE"); and (3) the Directors and Officers Liability Endorsement ("D&O Liability Endorsement"). (ECF No. 30-1 at p. 1).

**The Liability Coverage Form**

The Liability Coverage Form addresses bodily injury, personal injury, advertising injury, property damage, and medical claims against the Associations. (ECF No. 30-4 at p. 2). It is undisputed that the claims for which Beazer seeks coverage do not fall into any of these coverage categories. (ECF No. 42-1 at p. 5). Nonetheless, further discussion of the Liability Coverage Form is warranted before addressing the two endorsements to it — by which Beazer claims coverage.

Section II of the Liability Coverage Form defines "Who is an Insured." (ECF No. 30-4 at p. 16).[6] Essentially, coverage is limited to the Associations and their agents for matters otherwise falling within the liability contemplated by the policy (*i.e.*, bodily injury, property damage, etc.). *Id.* Builders/developers like Beazer are not included in this definition. *Id.* Additionally, individual "unit-owners" are not explicitly included in this definition. *Id.*

Regarding injuries occurring in, or due to common areas, the apparent lack of coverage for unit-owners under the Liability Coverage Form is worth noting. Each individual unit-owner in a homeowners or condominium association also owns an undivided percentage interest in the common areas. (ECF No. 30-2 at p. 15). This includes a developer like Beazer to the extent it also retains ownership of units in the development. Accordingly, along with liability for injuries occurring in common areas as members of the Associations, unit-owners also face liability for

---

[6] Three different editions of the Liability Coverage Form were utilized over the nine-year coverage term; specifically, PB 06 06 (01 01), PB 00 06 (04 11) and PB 00 06 (11 14). The most recent version of this Form was attached to Nationwide's Motion. (ECF No. 30-4).

9

injuries or damages related to the common areas through their ownership interest in those areas, yet under the language of the Policies, arguably no such coverage exists.

**The MAE**

The MAE, form PB 90 19, is a required policy endorsement under Maryland law, which makes several changes to the Nationwide Policies. (ECF No. 1-11 at pp. 103–07). Most notably, the MAE includes "Condominium or Townhouse Association Amendments," which are applicable to the Associations here. Specifically, this provides an amendment to the definition of "Who Is An Insured" within the Liability Coverage Form. *Id*. at pp. 106–07. In this regard, the MAE provides, in pertinent part:

> D. In the LIABILITY COVERAGE FORM, under Section II. WHO IS AN INSURED, the following is added
>
> 7. The developer *in the developer's capacity as a unit-owner*, but only with respect to the developer's liability arising out of:
>
>> a. The ownership, maintenance or repair of that portion of premises which is not owned solely by the developer; or
>> b. The developer's membership in the association.
>
> *HOWEVER, the insurance afforded with respect to the developer does not apply to liability for acts or omissions as a developer.*
>
> 8. Each other unit-owner of the described condominium, but only with respect to that person's liability arising out of the ownership, maintenance or repair of that portion of the premises which is not owned solely by the unit-owner or out of that person's membership in the association.

(*Id*. at p. 107) (emphasis added). With regard to the MAE's amendment, Nationwide explains:

> [I]f a unit-owner gets sued for water damages to other units caused by faulty pipes owned by the Association which run through a developer-owned unit, the Association policy will respond. Or if a visitor trips and falls in the common area and attempts to impose liability on the unit-owner, the Association's policy will respond.

(ECF No. 30-1 at p. 15).

10

The MAE also specifies the policy endorsements that it purports to amend, under **Section G — Amendments to Endorsements**. (ECF No. 1-11 at pp. 104–07). Notably, the only listed endorsements are the Employment Practices Liability Endorsement and Cyberone Coverage. The D&O Liability Endorsement is not listed. Notwithstanding this limiting language in the MAE, Beazer contends that the MAE should be read as amending the definition of "insured" under the D&O Liability Endorsement to the Policies. Under this theory, Beazer would add D&O coverage for unit-owners, including developers like Beazer, when sued in their capacity as unit-owners.

**The D&O Liability Endorsement**

This brings the Court to the second of the two endorsements— the D&O Liability Endorsement. As outlined below, this endorsement covers the Associations' Board Members and defined officers for wrongful acts taken in their official capacities as officers or directors, or others acting at the direction of officers or directors acting within the scope of their duties to the Associations. (ECF No. 30-1 at p. 9). Not surprisingly, the endorsement contains its own definition of who qualifies as an "insured" so as to be entitled to such coverage:

1. With respect only to the coverage provided by this endorsement *and superseding any other meaning*:

    **"Insured"** means:
    a. You;
    b. Your "directors" or "officers," but only with respect to their duties for you;
    c. Your current or former;
        (1) Employees;
        (2) Committee members;
        (3) Board members;
        (4) Volunteers;
        but only while acting at our direction, or the direction of your "directors" or "officers," and within the scope of their duties for you.
    d. Your property or real estate manager; but only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.

11

>             HOWEVER, your property or real estate manager is not an "insured" for "claims" or "suits" brought against them by you.
>
> 2. **EXCLUSIONS**
>
>     g. For transactions of any "insured" gaining a personal profit or advantage not shared equitably by your owners (ECF No. 1-20 at p. 93)
>
> 3. **"Wrongful Act"** means any actual or alleged negligent:
>     a. Act;
>     b. Error;
>     c. Omission;
>     d. Mistake;
>     e. Misstatement; or
>     f. Breach of duty;
>     committed by or at the direction of a "director" or "officer" while acting within the scope of their duties, individual or collectively

(ECF No. 1-20 at pp. 95) (emphasis added). Beazer does not contend that it is entitled to coverage based on the definition of "insured" in the D&O Liability Endorsement as set forth above; rather, its argument for coverage depends on the effect, if any, that the MAE has on the D&O Liability Endorsement's definition. (ECF No. 42-1 at p. 5).

**Beazer is Not an "Insured" for Purposes of D&O Coverage**

Beazer argues that if the MAE modifies the D&O Liability Endorsement definitions, as it did for the Condominium and Townhouse Associations coverage in the General Liability Form, such that "unit-owners" (including Beazer in its capacity as a unit-owner) Beazer should be afforded D&O coverage. *Id*. The crux of Beazer's argument is that, at best, the MAE and D&O Liability Endorsement, when read together, are ambiguous as to the effect they are to have on each other, and such ambiguity must be resolved in Beazer's favor. *Id*. at p. 6. The Court disagrees that an ambiguity is present.

First, the MAE is not silent on the effect it has on the D&O Liability Endorsement. As discussed previously, the D&O Liability Endorsement is conspicuously absent in "Section G"— of the MAE — Amendments to Endorsements. If the MAE was intended to modify the D&O

Liability Endorsement, the MAE could have included that endorsement in the list of those it explicitly modified. The only reasonable interpretation of that absence is that the MAE was not meant to modify endorsements not listed. Moreover, the D&O Liability Endorsement is not silent as to whether its definitions are subject to other meanings within the Policies, which include the MAE. To the contrary, the D&O Liability Endorsement specifies that as to the additional coverage it provides, its definition of "insured" should be interpreted as "superseding any other meaning." (ECF No. 30-6).

This sufficiently distinguishes the present case from *Xquisite Transportation, LLC v. Travelers Indemnity Company*, the case chiefly relied upon by Beazer. 2009 WL 10682238 (D. Md. June 8, 2009). In *Xquisite*, an insured sought uninsured motorist coverage ("UMC") following damage to a commercial vehicle, including reimbursement for lost revenue and post-repair diminution in value. *Id*. at 2–3. Addressing lost revenue, the Court noted that although the policy's *standard coverage* included "loss of use," the policy stated that such coverage did not apply where "modified by the UMC." *Id*. (emphasis added). The UMC endorsement did not include loss of use, and the Court dismissed the insured's claim for such damages. *Id*. As for diminution in value, the policy's standard coverage explicitly excluded such claims (as did an amendatory endorsement the Court termed "one of form rather than substance"), but the required Maryland Endorsement explicitly provided that the standard coverage exclusion for such claims "does not apply." *Id*. at 3, n.7 (The Court's opinion does not mention whether the uninsured motorist coverage endorsement addressed diminution coverage at all). The Court concluded that because the UMC endorsement did not state what effect, if any, the Maryland Endorsement had on the UMC endorsement (and vice versa), the policy was ambiguous. *Id*.

13

By contrast, here, the MAE did not include the D&O Liability Endorsement as an endorsement it was intended to amend, and the D&O Liability Endorsement specifically states that its definition of insured supersedes *any other definitions within the Policies*. The MAE, as part of the Policies, falls within the limits of "any." In this sense, the D&O Liability Endorsement is far more explicit than the UMC endorsement in *Xquisite*: the UMC endorsement was silent; the D&O Liability Endorsement is not.

Read alone or together, the plain language of these endorsements does not include Beazer as an insured. Accordingly, the Court finds that Beazer is not entitled to coverage under the Policies. Such a finding works no violence to, and in fact promotes, all portions of the Policies being interpreted as complimentary and not in conflict with each other.[7] Given the potential "gap" in coverage for unit-owners for bodily injury, personal injury, or property damage claims stemming from their ownership interest in the common areas, and exposure to such claims by virtue of being members of associations that themselves were subject to such ownership liability, the MAE expansion makes logical sense with regard to such coverages, especially given the absence of conflicting provisions. By contrast, Beazer's reading forces the Court to ignore the fact that D&O Liability Endorsement is not listed as one of the Endorsements being modified by

---

[7] The D&O Liability Endorsement excludes coverage for the Associations' directors and officers to the extent they are sued for decisions they make that relate to construction and development activities (such as loss or damage stemming from construction activities or materials). Beazer argues that this exclusion would be unnecessary if developers (through the MAE) were not included as insured. The Court disagrees. First, a Board (whether or not any of its members are developers or run construction companies) could make decisions regarding such matters. Second, to the extent that the MAE definition is read to add Beazer as an insured, as Beazer urges, it is in its capacity as a unit-owner, not as developer, as its activities as a developer are explicitly excluded by the MAE. (ECF No. 1-11 at p. 107) ("HOWEVER, the insurance afforded with respect to the developer does not apply to liability for acts or omissions of the developer").

the MAE, and would render meaningless the D&O Liability Endorsement language specifying that its definition of "insured" supersedes any other definition.[8]

Accordingly, because the Court concludes that Beazer unambiguously is not an insured under the Policies, summary judgment in favor of Nationwide is justified.

**The Claims Asserted Do Not Fall Within the D&O Coverage**

Even assuming *arguendo* that Beazer, in its capacity as a unit-owner,[9] was an insured under the D&O Liability Endorsement, such status would not help Beazer. As noted above, the D&O Liability Endorsement specifically excludes from coverage "transactions of any 'insured' gaining a personal profit or advantage not shared equitably by your owners." (ECF No. 1-20 at p. 93). Given that Beazer was sued for wrongfully burdening the Associations (and ultimately, the other unit-owners) with its share of the common area expenses, such transactions would be excluded by the plain language of the Endorsement. This conclusion is in keeping with the reasonable expectations of the parties to such a policy containing such a provision, as this Court observed in *Hyde v. Fidelity & Deposit Company*, 23 F. Supp. 2d 630, 634 (D. Md. 1998):

> Furthermore, Directors and Officers insurance does not protect the insureds from claims by the corporation itself. It is difficult to argue that it is within the reasonable expectations of the parties to such an insurance contract that the corporation was paying D &O insurance premiums to protect the directors and officers from the consequences of breaching their duty to the corporation. [C]overage for claims made by the corporation against the officers and directors [do] not fall within the scope of the 'insured's reasonable expectation of coverage….

*Id*. (quoting *Mt. Hawley Ins. Co. v. FSLIC*, 665 F. Supp. 469, 484 (C.D. Ca. 1987)).

---

[8] The Court is also unpersuaded by Beazer's argument that there is a distinction between providing a "definition" of "insured" (as per the D&O Liability Endorsement) versus setting forth "Who Is An Insured" as described in the Liability Coverage Form and MAE. The Court views this as a distinction without a difference.

[9] The parties contest whether Beazer was, or was not, a unit-owner. In support of its position, Beazer supplies the affidavit of Larry Chazin, an Area Manager at Beazer, which articulates that "Beazer was an owner of units within both Associations and, as a unit-owner was a member of the Associations." (ECF No. 42-13 at p.1). For purposes of its analysis under Rule 56, the Court will accept that Beazer was a unit-owner as contemplated by the MAE. This status, however, does not ultimately help Beazer's case.

Additionally, Beazer was not sued in its capacity as a unit-owner. As Beazer itself asserted in a pleading in the underlying litigation:

> The Association did not sue Beazer in its capacity as an Owner and does not contend that Beazer violated the Declaration in its capacity as an Owner . . . Section 13.1, upon which the Association bases its claim, refers to "Declarant" (not "Owner") which is defined in §1.28 as Beazer in its capacity as Declarant, not as a lot or unit Owner. Any recovery by the Association under the Declaration will be from Beazer in its capacity as the Declarant, not as an Owner.

Beazer's Reply Brief in Support of Motion for Summary Judgement, Civil Action No-17-645-JKB (the GQA Litigation), attached to Nationwide's Opposition. (ECF No. 44-2 at pp. 22–23).

Beazer was sued based on its alleged breach as a developer/declarant in the Declaration of Covenants. It was not sued because it appointed or elected friendly Board members in its initial capacity as developer (for its original appointments) and later as a unit-owner. It is not improper or actionable to appoint or vote for a person who may be friendly to one's interest. Beazer was accused of improperly using its influence over its "friendly" Board members as an instrumentality for its breach under the Declaration of Covenants, and the associated nondisclosure of it. Further, Beazer, based on its status as unit-owner, was never a member of the Associations' Boards nor was it in its capacity of unit-owner acting at the direction of those Board members acting within the scope of their duties as required to qualify as a "Wrongful Act" under the D&O Coverage. (ECF No. 1-20 at pp. 94–95). To the contrary, the allegation is that the Board members were working at the direction of *Beazer* in helping to aid it in violating the obligations it undertook for the common area expenses in its original capacity as developer.

Finally, Beazer urges that the underlying lawsuits sought recovery of fees and costs pursuant to the Declaration and Covenants, which, it contends, only provide such rights against unit-owners. That may well have been Beazer's defense to the demand for fees and cost—*i.e.,* that there was no right to fees and costs because Beazer was not a unit-owner—but the

16

Associations' allegation was merely that the contract entitled it to collect fees from Beazer based on its *breach* (and failure to disclose), not its *status*. Having itself previously characterized the allegations as being sued in its capacity as a Declarant, not a unit-owner as quoted above, Beazer cannot now rely on the mere inclusion of the word "owner" in quoted contract language to recharacterize the allegations in an attempt to gain coverage.

**Nationwide Owed No Duty to Indemnify Beazer**

Having found that Nationwide had no duty to defend because Beazer did not qualify as an insured and, in any event, the underlying lawsuits did not trigger coverage, there is no duty to indemnify. *Cf. Nautilus Ins. Co. v. REMAC*, 956 F. Supp. 2d 674, 681–82 (D. Md. 2013).

## IV. CONCLUSION

For the foregoing reasons:

1. Plaintiffs' Motion for Summary Judgment is **GRANTED**; and
2. Defendant's Cross-Motion for Partial Summary Judgment is **DENIED.**

A separate Order will follow.

Date: October 1, 2019 /s/
J. Mark Coulson
United States Magistrate Judge